**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

---

No. 93-2237

---

UNITED STATES OF AMERICA

Plaintiff-Appellee,

versus

DEBRA ROBINSON RICO, and
MANUAL ARMANDO RICO,

Defendants-Appellants.

---

Appeals from the United States District Court
for the Southern District of Texas

---

(April 21, 1995)

Before VAN GRAAFEILAND[*], JOLLY and WIENER, Circuit Judges.

WIENER, Circuit Judge:

In this direct criminal appeal, we review whether evidence challenged as having been obtained in violation of the Fourteenth and Fourth Amendments was properly admitted against Defendant-Appellant Manuel Rico in a joint trial with his wife, Defendant-Appellant Debra Rico, for various narcotics' offenses. We also consider whether Debra's Sixth Amendment guarantee of effective assistance of counsel was violated when she and Manuel were

---

[*]Circuit Judge of the Second Circuit, sitting by designation.

represented by the same attorney at trial. Finding that the evidence was properly admitted and that no constitutional violation resulted from the joint representation, we affirm the convictions of both defendants.

I

FACTS AND PROCEEDINGS

In 1992, Federal Bureau of Investigation (FBI) agents in Houston began investigating Debra and Manuel after those agents received information from their colleagues in Philadelphia that a Columbian-based drug group in Houston was the primary source of cocaine for a Philadelphia cocaine trafficking organization. The FBI arranged for a cooperating witness (CW) who was a member of the Philadelphia organization to drive to Houston in a Cadillac (first Cadillac) equipped with false compartments, and there to pick up cocaine from the Houston source and drive it back to Philadelphia.

Pursuant to the plan, the CW drove to Houston, made contact with the Houston source, and arranged a meeting in the CW's hotel room. Later, several unidentified persons met with the CW in his hotel room, obtained the keys to the first Cadillac, drove it to a residence located on Ivy Oaks Lane (the Ivy Oaks residence), parked in the garage of that house, and closed the garage door. About an hour later, the same car emerged from the garage and was driven back to the CW's hotel where the keys were returned to the CW. Accompanied by some of the FBI agents, the CW then drove the first Cadillac to a garage where the false compartments were opened, revealing the presence of 25 kilograms of cocaine.

2

While that was transpiring, others of the FBI agents trailed the unidentified persons who had delivered the first Cadillac to the CW at his hotel. Those persons led the FBI agents to another hotel at which, according to the CW, another courier was staying. That courier had driven a second Cadillac (second Cadillac) from Philadelphia to pick up narcotics from the Houston supplier. While the agents observed, one of those persons entered the hotel, came out a short while later, got into the second Cadillac, drove it to the same Ivy Oaks residence to which the first Cadillac had been driven, parked the second Cadillac in the garage, and closed the garage door. Agents maintained uninterrupted surveillance on that house while the second Cadillac remained parked inside the garage.

Early the next morning, agents conducting that surveillance saw a van drive up to the Ivy Oaks residence and watched as a man and woman fitting the descriptions of Manuel and Debra got out of that vehicle and went inside the house. About an hour later, the same female and a male left the residence and got back into the van at the same time that the garage door was being opened. The van and the second Cadillac were driven away together. Surveillance agents recognized Debra as the driver of the van, but could only determine that her passenger was a male.

The van and the second Cadillac were driven only four to eight blocks before they were parked in front of a house on Clear Cove Lane (the Clear Cove residence), located in the same subdivision as

3

the Ivy Oaks residence.[1]  Approximately two hours later, FBI agents watched as two hispanic males stood next to the van and talked. The van and the second Cadillac were then driven away in tandem to the hotel where the second Cadillac had been picked up on the previous day.  After parking that car, the driver went into the hotel while the woman driver of the van and a male passenger waited in it.  A short while later, the driver of the car came out of the hotel and joined the other man and the woman in the van, whereupon the three left together in it.  FBI agents later discovered that the van had been rented and that Manuel was listed as one of its drivers.

Later that same day, a dark-complected hispanic male was observed departing from the second hotel and driving away in the second Cadillac.  Pursuant to the FBI's request, state police stopped the second Cadillac shortly after it left the hotel and discovered that the driver of that car possessed a Pennsylvania driver's license, which listed a Philadelphia address.  The officers obtained the driver's written consent to search the car, during which drug-sniffing dogs positively alerted to the trunk and passenger compartment of the vehicle.  That car, the second Cadillac, was then taken to the Sheriff's Office for a closer inspection, which revealed the presence of 36 kilograms of cocaine hidden in compartments under the floorboard.

---

[1]The record is unclear as to the precise distance in blocks between the Ivy Oaks and Clear Cove residences.  The testimony at trial established only that the distance was between four and eight blocks.

4

The following afternoon, FBI agents executed a warrant to search the Ivy Oaks residence. When they entered the house they found it to be unoccupied and sparsely furnished. During the ensuing search, agents discovered a "trap door" leading from the garage to an attic in which ten kilograms of cocaine were stashed. In a station wagon parked in the garage, agents found an automobile title and registration slip in Debra's name, both of which listed the Clear Cove address as her residence. Agents also recovered two boxes containing 42 kilograms of cocaine and numerous papers and documents belonging to Debra and Manuel (many of which were addressed to the Clear Cove residence) in a secret room of the Ivy Oaks residence; the door to that room was hidden behind a large mirror in the master bedroom. The search also turned up $3000 in cash located in a kitchen cabinet.

Based on the information that the agents had gathered from their surveillance of the two Cadillacs and the van and from the evidence obtained during the search of the Ivy Oaks residence, they deduced that the Ivy Oaks residence was used as a "stash house" for the Houston organization. They also suspected, based on such information, that Manuel and Debra were involved in the organization and resided at the Clear Cove residence.

The agents grew concerned that, as the two houses were located in such close proximity, someone connected with the drug operation might travel from the Clear Cove residence to the Ivy Oaks residence and discover the presence of the agents, or might have already noticed them searching the Ivy Oaks stash house. As a

5

precaution against such possibilities, Agent Daniel Bingham was dispatched to watch the Clear Cove residence and to report any unusual activity. Soon after Agent Bingham arrived at that house, he observed some activity inside. Then, as he watched, a man (later identified as Julio Cuero) emerged from the house, approached the driver's side of a blue van which was parked in front of the residence, and reached inside the vehicle.[2] Agent Bingham testified that he was immediately concerned that the suspect might be moving drugs, money, or possibly even guns, from the house to the van. Agent Bingham then saw Cuero walk to the rear of the van, get into that vehicle, and, according to the agent, "put[] something in or out."

When Agent Bingham observed that activity, he radioed for assistance. He testified that he thought that the van, like the two Cadillacs, must contain cocaine and that Cuero and the persons inside the Clear Cove residence must be preparing to leave. He explained that, "[i]f that was (sic) the case, we wanted to effectuate an arrest or a car stop." Three agents responded immediately to Agent Bingham's call for backup.

The additional agents arrived within minutes, whereupon all four approached the house with guns drawn. While one stopped and apprehended Cuero from the van the other three agents split up: one proceeded to the rear of the house and the other two continued toward the front door. When the two agents arrived at that door

_____

[2]The blue van was registered to Cuero and was not the same van that the FBI had earlier observed driving in tandem with the Cadillac and which was rented by Manuel and another man.

they knocked on it, but the door was apparently unlatched and ajar, for it swung open on its own. When it did, one of the agents saw a large hispanic male staring at him. Having been advised that the members of the Houston organization might be armed and violent, the two agents immediately entered the house with guns still drawn, ordered the occupants to lie down on the floor, then conducted a protective sweep to secure the premises. Some of the suspects, including Debra, were then taken outside.

The agents learned from the suspects that Debra and Manuel owned the Clear Cove home, so they asked Manuel for permission to search the premises. He agreed and signed a consent-to-search form. Although the agents uncovered no drugs or drug paraphernalia during that search, they did find various documents and items that tied the Clear Cove residence to the stash house on Ivy Oaks.

The agents also invited Debra and Manuel to discuss the cocaine and documents found in the Ivy Oaks house. Debra refused and asked for a lawyer, but Manuel agreed to talk to the agents. After they advised Manuel of his <u>Miranda</u> rights and he signed an advice-of-rights form, the agents took him upstairs to a bedroom and questioned him about his involvement in the Houston organization. Agents Luis Vasquez and Bingham, who conducted the interrogation, testified that Manuel confessed to his involvement in the Houston organization, admitted that he drove the second Cadillac between the hotel and the Ivy Oaks residence, conceded that he had leased the Ivy Oaks residence for use as a stash house, and volunteered that he had personally helped to unload several

7

shipments of cocaine there. The agents testified that they talked with Manuel for about an hour and one-half, during which time they neither threatened him nor promised him anything in exchange for his cooperation. The agents neither recorded any of Manuel's statements nor reduced them to writing.

Not surprisingly, Manuel's version of his discussion with the agents is quite different. He denies confessing and insists that all he told the agents regarding his connection with the Ivy Oaks residence was that he (1) helped lease it for someone else (but had no idea that the person was going to use it to store cocaine), (2) did nothing there other than to perform yard work, and (3) loaned his wife's station wagon to the lessee earlier that month. He also claims that the agents accused him of being a Columbian drug dealer and threatened him and Debra with life imprisonment for their crimes.

As hereafter discussed in greater detail, Manuel and Debra filed motions to suppress the evidence seized in the warrantless search of the Clear Cove residence or obtained as a direct result of that search. The district court denied those motions.

Debra and Manuel were subsequently tried and convicted by a jury of conspiracy to possess with intent to distribute over five kilograms of cocaine in violation of 21 U.S.C. §§ 846 and 841, and of the underlying substantive possession offense in violation of 21 U.S.C. § 841 and 2 U.S.C. § 2. The district court sentenced Manuel to two concurrent terms of 360 months, followed by a term of five years supervised release; and sentenced Debra to two concurrent

terms of 240 months imprisonment, followed by a term of five years supervised release.  This appeal followed.

II

ANALYSIS

A.   Manuel Rico

Manuel claims that the district court erred in (1) denying a motion to suppress statements he allegedly made to agents, and (2) allowing the government to introduce physical evidence obtained during the search of his home, the Clear Cove residence, which was conducted after the agents had entered the residence, conducted a protective sweep, and obtained Manuel's purportedly coerced consent to search the premises further.[3]

   1.   Motion to Suppress Evidence of Manuel's Statements

Manuel was arrested in his home on various narcotics-related charges.  Over his objection, two arresting agents testified at trial about statements Manual purportedly made after his arrest. Manual had moved to suppress evidence of those statements, claiming that (1) they were the fruit of a warrantless entry and arrest inside his residence, and (2) any statements that he may have made were coerced, regardless of whether the entry and his arrest were lawful.  We review a district court's denial of a motion to suppress by viewing the facts in the light most favorable to the prevailing party (here, the government), accepting the district

---

[3]Manuel also argues that there is no transcript of his sentencing hearing, thus precluding him from reviewing the proceeding.  But Manuel's argument is not merely frivolous; it is patently false.  The record contains a full transcript of Manuel's sentencing hearing.

court's factual findings unless clearly erroneous, and considering all questions of law de novo.[4]

        a.    *Warrantless Entry of Clear Cove Residence*

Manuel argues that evidence of statements he purportedly made to FBI agents after they had entered the Clear Cove residence to conduct a protective sweep should have been suppressed as fruit from the poisonous tree, because, according to Manuel, the statements were obtained as a direct result of that allegedly unconstitutional entry. He does not argue that the FBI agents lacked probable cause to enter his Clear Cove residence; rather, he complains that his Fourth Amendment guarantee to be free from unreasonable searches and seizures was violated because the agents did not have a warrant to enter his home.[5] The government relies on the "exigent circumstances" exception to the warrant requirement to justify its entry into the Clear Cove residence.

        i.   <u>Exigent Circumstances</u>

Although presumptively <u>un</u>reasonable, a warrantless entry will survive constitutional scrutiny if, inter alia, "exigent circumstances exist to justify the intrusion."[6] The burden is on

---

[4]<u>United States v. Shannon</u>, 21 F.3d 77, 81 (5th Cir.), <u>cert. denied</u>, 115 S. Ct. 260 (1994).

[5]U.S. CONST. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . .").

[6]<u>United States v. Richard</u>, 994 F.2d 244, 247 (5th Cir. 1993); <u>see</u> <u>Payton v. New York</u>, 445 U.S. 573, 589 (1980).

the government to prove the existence of the exigency.[7]

Exigent circumstances "include those in which officers reasonably fear for their safety, where firearms are present, or where there is a risk of a criminal suspect's escaping or fear of destruction of evidence."[8]  In evaluating whether exigent circumstances existed, we have found relevant the following factors:

> (1) the degree of urgency involved and amount of time necessary to obtain a warrant;
> (2) [the] reasonable belief that contraband is about to be removed;
> (3) the possibility of danger to the police officers guarding the site of contraband while a search warrant is sought;
> (4) information indicating the possessors of the contraband are aware that the police are on their trail; and
> (5) the ready destructibility of the contraband and the knowledge "that efforts to dispose of narcotics and to escape are characteristics behavior of persons engaged in the narcotics traffic."[9]

There can be little doubt that exigent circumstances existed once the agents abandoned their covert surveillance of the Clear Cove residence and arrested Cuero in the van that was parked in front of that residence.  As the district court aptly noted, "if you are standing around in the front yard arresting people in the driveway, you need to make sure that there is not assistance to him

---

[7]United States v. Thompson, 700 F.2d 944, 946 (5th Cir. 1983).

[8]United States v. Mendoza-Burciaga, 981 F.2d 192, 196 (5th Cir. 1992), cert. denied, 114 S. Ct. 356 (1993).

[9]Richard, 994 F.2d at 248 (quoting Thompson, 700 F.2d at 948)); accord United States v. Riley, 968 F.2d 422, 425 (5th Cir.), cert. denied, 113 S. Ct. 507 (1992).

11

by people in other parts of the premises."[10]  That observation is particularly cogent here, for the agents had a reasonable belief, based on reliable information, that the suspects inside the house might be armed and dangerous.

But our scrutiny does not begin with the predicament the agents faced at the instant that they chose to abandon their covert surveillance, approach the Clear Cove residence, and seize Cuero.[11] Rather, we must begin with a consideration of remote events, more akin to examining a video tape by instant replay than to examining a snapshot.  We thus review the entirety of the agents' investigative tactics, particularly those leading up to the exigency alleged to have necessitated the protective sweep.[12]  In the instant case, it was the agents' actions leading to, and including, their decision to discontinue covert surveillance and make the open and obvious arrest of Cuero in front of the Clear

---

[10]Or, we hasten to add, that suspects inside are destroying evidence.

[11]See United States v. Munoz-Guerra, 788 F.2d 295, 297-98 (5th Cir. 1986) (stating that review is not confined to circumstances after police made presence known; rather issue is "whether exigent circumstances justified the agents' initial decision to approach the [premises]").

[12]United States v. Duchi, 906 F.2d 1278, 1284 (8th Cir. 1990) ("For the claim of exigent circumstances to be adequately evaluated, the . . . question to ask is:  how did those urgent circumstances come about?  This antecedent inquiry))into the reasonableness and propriety of the investigative tactics that generated the exigency))seems to be what courts have in fact been doing in these kind of cases."); United States v. Rosselli, 506 F.2d 627, 630 (7th Cir. 1974) (Stevens, J.) ("When the emergency justification is advanced, we believe it appropriate to appraise the agents' conduct during the entire period after they had a right to obtain a warrant and not merely from the moment when they knocked on the front door.").

12

Cove residence that made the immediate warrantless entry of that house a foregone conclusion.[13] At that point there was no stopping.

## ii. Manufactured Exigency

Just as exigent circumstances are an exception to the warrant requirement, a police-manufactured exigency is an exception to an exception. Manuel contends that the agents, by deciding to abandon covert surveillance when they did, created or "manufactured" an exigency that otherwise would not have existed, and that therefore the government may not now rely on that emergency to justify the warrantless entry into the Clear Cove residence. "Exigent circumstances . . . do not pass Fourth Amendment muster if the officers deliberately create them."[14] We "distinguish between cases where exigent circumstances arise naturally during a delay in obtaining a warrant and those where officers have deliberately created the exigent circumstances."[15]

---

[13]See Richard, 994 F.2d at 249 (holding that agents created exigency when they announced themselves as "warrantless entry became a foregone conclusion once officers knocked"); United States v. Hultgren, 713 F.2d 79, 88 (5th Cir. 1983) (analyzing whether "[t]his is . . . a case where exigent circumstances were deliberately created by the government").

[14]Richard, 994 F.2d at 248; see Hultgren, 713 F.2d at 88 ("This is not a case where the exigent circumstances were deliberately created by the government. There is no evidence whatsoever that the government planned or `faked' the precipitating cause of the exigent circumstances . . . ."); cf. United States v. Randall, 887 F.2d 1262, 1266-67 (5th Cir. 1989) (holding that exigent circumstances justified warrantless entry into hotel room, as agents faced "now or never" situation when suspects showed illegal narcotics and demanded informant obtain purchase money).

[15]United States v. Webster, 750 F.2d 307, 327 (5th Cir. 1984), cert. denied, 471 U.S. 1106 (1985).

Exigencies can be manufactured guilelessly or ulteriorly. Although "[t]here is no question that the deliberate creation of urgent circumstances is unacceptable[,] . . . bad faith is not required to run afoul [of the Fourth Amendment]."[16] As the Eighth Circuit has reminded us, "the danger to constitutional rights more often comes from `zealous officers' rather than faithless ones."[17] In determining whether the exigent circumstances were manufactured by the agents, we therefore must consider not only the motivation of the police in creating the exigency but also "the reasonableness and propriety of the investigative tactics that generated the exigency."[18] As there is no evidence here that the FBI agents acted

---

[16]Duchi, 906 F.2d at 1284. See generally 2 WAYNE R. LeFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 6.5(b), at 662 (2d ed. 1987) (analyzing United States v. Rubin, 474 F.2d 262 (3d Cir.), cert. denied, 414 U.S. 833 (1973), by focusing, in part, on whether "investigative technique" of tailing suspect was "logical" under the circumstances, making apprehension necessary "once it reasonably appeared that [the suspect] was aware he was being followed").

[17]Duchi, 906 F.2d at 1284 (citing United States v. Johnson, 333 U.S. 10, 13 (1948) (Jackson, J.)).

[18]Id.; see United States v. Johnson, 12 F.3d 760, 764 (8th Cir. 1993) (citing Duchi), cert. denied, 114 S. Ct. 2689 (1994). But cf. United States v. Socey, 846 F.2d 1439 (D.C. Cir.) ("As long as the police measures are not deliberately designed to invent exigent circumstances, we will not second-guess their effectiveness."), cert. denied, 488 U.S. 858 (1988).

Although we recognize that in Socey the D.C. Circuit appears to imply that courts should review only for bad faith a defendant's claim that law enforcement authorities created an exigency, we do not read our circuit precedent so narrowly. In both United States v. Munoz-Guerra, 788 F.2d 295 (5th Cir. 1986), and United States v. Richard, 994 F.2d 247 (5th Cir. 1993), for example, we held that law enforcement officers had manufactured the exigencies that made necessary subsequent warrantless entries, but in neither opinion did we find that those officers had acted in bad faith. We also find most persuasive the Eight

14

in bad faith or that they specifically intended to create an exigency in avoidance of the warrant requirement, we need only review the reasonableness of the agents' investigative tactics))in particular, those actions that led up to the decision to discontinue covert surveillance, approach the Clear Cove residence, and seize Cuero.

"Our first concern in analyzing a claim of a manufactured exigency is whether agents could have obtained a search warrant prior to the development of the exigent circumstances upon which they relied."[19]  "It is, of course, axiomatic that agents are not required to obtain a search warrant as soon as it is practicable to do so."[20]  Here the agents clearly lacked sufficient time between the point at which the circumstances that the agents claim motivated them to enter that residence developed and the point at which probable cause to enter the Clear Cove residence developed. Agent Bingham was dispatched to watch the Clear Cove residence almost immediately after agents had discovered significant additional information linking narcotics found at the Ivy Oaks residence to persons residing at Clear Cove.  Shortly after he arrived at Clear Cove, Bingham observed activities both inside and outside the house that, according his testimony, led him to believe

---

Circuit's reasoning in Duchi and agree that Fourth Amendment jurisprudence has consistently emphasized that we should focus on the reasonableness of the search and seizure))not on whether the officers acted in good or bad faith.

[19]Webster, 750 F.2d at 327.

[20]Id.

15

that a felony suspect (possibly <u>all</u> suspects) was preparing to leave in a vehicle containing contraband. We are satisfied that the short span of time between the agents' discovery of evidence linking the two residences and Bingham's observations was not sufficient to seek and obtain a warrant.

Finding that there was insufficient time in which to obtain a warrant prior to the occurrence of the events that gave rise to the exigency, we next consider whether the agents themselves nevertheless created the urgent situation by the use of unreasonable law enforcement tactics. Clearly, the agents acted appropriately in dispatching Agent Bingham to watch the Clear Cove residence once the search of the Ivy Oaks stash house revealed tangible evidence linking the two residences. Agent Bingham testified unequivocally that he thought that Cuero, a suspected felon, was preparing to leave in a van loaded with narcotics: "[I]t looked like these folks were getting ready to leave, and this vehicle [the van] was a load vehicle containing cocaine like the other vehicles we were already familiar with." That belief was clearly justified, just as were his actions, when, at that point, he radioed for backup. Responding to that appropriate call, three other agents arrived within minutes and, with Agent Bingham, decided to approach the house and to arrest or detain Cuero and the others before they were able to drive away in vehicles suspected of containing contraband. It was certainly reasonable for the agents to arrest or detain unidentified felony suspects before they escaped or removed contraband.

16

Thus if we conclude that Agent Bingham's beliefs were reasonable, based on his experience, knowledge, and observations at the time, then circumstances existed that justified or even required immediate action. On the other hand, if we conclude that Agent Bingham was unreasonable in believing, based on those same circumstances, that the suspects were preparing to depart with contraband, then there would have been essentially no reasonable justification or need for the agents to approach the Clear Cove residence and confront the suspects, which was the tactical decision that made the subsequent protective sweep a foregone conclusion. And our precedent makes clear that the government cannot rely on exigent circumstances to excuse a warrantless entry to conduct a protective sweep if the circumstances and thus the sweep were made necessary by the law enforcement officers' decision to abandon a covert surveillance and confront the suspects without any justification whatsoever.[21] That is a classic example of a police-manufactured exigency.

But the very question of the reasonableness of Agent Bingham's beliefs is what makes this case a close one. Unfortunately, in the

_____

[21]See, e.g., Richard, 994 F.2d at 249-50 (holding that agents created exigency when they announced themselves as "warrantless entry became a foregone conclusion"); Munoz-Guerra, 788 F.2d at 298-99 (rejecting argument that exigent circumstances excused warrantless entry where agents' confrontation of suspects under covert surveillance was without any justification); cf. United States v. Carillo-Morales, 27 F.3d 1054 (5th Cir. 1994) (exigent circumstances justified arrest of suspects in front of garage, which made warrantless entry of building a foregone conclusion, as police reasonably risked loss of felony suspect and contraband had they delayed confrontation), cert. denied, 115 S. Ct. 1163 (1995).

suppression hearing neither the district court nor the parties focused on the information and observations upon which Bingham relied in concluding that the suspects were preparing to leave. In fact, the district court adduced no evidence at all during the suppression hearing, electing instead to consider proffers from each attorney as to what their witnesses would testify. Consequently, the facts pertinent to our review of the reasonableness of Bingham's conclusion are not as well developed as they should be to facilitate appellate review))making this already close case even more difficult to call.

In reviewing a district court's denial of a motion to suppress evidence, however, we "may consider not only the evidence from the suppression hearing but also evidence presented during the trial."[22] Our ability to do so helps us to some extent in this instance. At trial, Agent Bingham recounted several concrete details to substantiate the reasonableness of his belief that Cuero and the others were preparing to leave. He testified that he watched Cuero come out of the house, walk to the driver's side of the van, reach down around the floorboard area, and then go around to the back of the vehicle and climb inside. He also stated that he saw "some activity just in the door frame" of the house, leading him to believe that others too were preparing to leave, but on that point he did not elaborate further. Still, when we consider those observations in light of the information that Bingham knew at that

---

[22]United States v. Basey, 816 F.2d 980, 983 n.1 (5th Cir. 1987).

18

time as a result of the information from Philadelphia, the earlier surveillance, and the search of the Ivy Oaks residence, viewing all the facts in the light most favorable to the government as the prevailing party in the suppression hearing, we do not find "unreasonable" Agent Bingham's belief that Cuero, and possibly other suspects too, might have been preparing to leave. That leads us inexorably to the conclusion that the exigency was not created by illogical or unreasonable investigative tactics.

Our conclusion here, rejecting Manuel's argument that the FBI manufactured the exigency by arresting Cuero in front of the Clear Cove residence, is consistent with the result we reached in another recent case involving very similar facts. In <u>United States v. Carillo-Morales</u>,[23] we rejected an argument that officers created exigent circumstances by stopping a vehicle in front of a body shop, even though the police "almost certainly knew that stopping the [car] at the body shop would reveal their [the police's] presence to the [suspects] remaining inside, necessitating a protective search."[24] In that case, two men suspected of

_____

[23]27 F.3d 1054 (5th Cir. 1994), <u>cert. denied</u>, 115 S. Ct. 1163 (1995).

[24]<u>Id.</u> at 1062-63; <u>see also</u> <u>United States v. Mendoza-Burciaga</u>, 981 F.2d 192, 196 (5th Cir. 1992), <u>cert. denied</u>, 114 S. Ct. 356 (1993). In <u>Mendoza-Burciaga</u>, police apprehended a suspect as he apparently recognized the presence of law enforcement personnel and attempted to flee in a truck. The officers had earlier observed several other suspects in a house where the truck had been parked, but did not know whether they were still in there at the time of the arrest. We found that it was not clearly erroneous for the district court to find that exigent circumstances existed to enter the home; "[i]f others were in the house and armed, the officers would be in great danger." <u>Id.</u> at 197. As here, the officers in that case limited

19

involvement in a drug-trafficking conspiracy came out of a body shop and got into a nearby car. Based on information already obtained during the investigation, the police testified))as did Agent Bingham here))that they reasonably believed that the suspects were preparing to leave and that the vehicle in which they were departing contained contraband. We held that exigent circumstances justified the officer's decision to arrest the two suspects without a warrant in front of the body shop, even though the officers would then be left with no choice but to enter and secure that building to ensure their own safety. Had the officers not acted, we noted, they would have risked losing both the suspects and the contraband in the departing car. We rejected the argument that the police were required to follow the suspects in the car until they drove to a location out of sight of the body shop, so that when the arrests were made the suspicions of the suspects who remained inside that building would not be aroused, requiring the police to enter the body shop without a warrant to conduct a protective sweep.[25] Thus we found unavailing the argument that the officers manufactured

---

their initial search to that minimally necessary to secure the house.

[25]See, e.g., United States v. Webster, 750 F.2d 307, 328 (5th Cir. 1984) (rejecting argument that police manufactured exigent circumstances by failing to stop suspects before they entered hotel room), cert. denied, 471 U.S. 1106 (1985); see also United States v. Riley, 968 F.2d 422, 424-26 (5th Cir.) (holding that exigent circumstances justified securing residence, where police arrested suspect who had cellular phone and police reasonably believed arrestee's failure to call or return to house would alert occupants that "something had gone wrong"), cert. denied, 113 S. Ct. 507 (1992).

their own exigency.[26]

---

[26]The D.C. Circuit considered similar facts in United States v. Socey, 846 F.2d 1439 (D.C. Cir.), cert. denied, 488 U.S. 858 (1988), and arrived at the same conclusion that we did in Carillo-Morales, although, as we noted above, they applied a more deferential review of police procedures.

In Socey, the defendants contended that police officers intentionally created an exigency by stopping a vehicle))which the police reasonably believed was transporting narcotics))"unnecessarily and unreasonably" close to a house under surveillance, thus creating the need to conduct a protective sweep of those premises. Id. at 1448. An officer testified at the suppression hearing that the automobile could have been stopped five or six blocks from the residence, yet the D.C. Circuit concluded that the exigency had not been created by the police:

> We reject the Soceys' claim that Detective Brenner's decision to stop the Camaro was deliberate, in the sense that his underlying purpose was to subvert the warrant requirement. As an initial, factual matter, we note that the district court did not, in any sense, suggest that Brenner's actions were designed to create a commotion or, more generally, to manufacture an exigency. At most, the court stated that the actions of the police were "possibly ill-advised." The defendants' contrary claims find no support in the record.

> Reviewing the totality of the circumstances, we find that Brenner's decision to stop the Camaro was anything but "manufactured." After [two other officers] left their surveillance position to pursue [another suspect's] Datsun, Brenner was faced with the incompatible duties of watching the house and stopping a departing automobile, possibly containing contraband, out of sight of the house. Under the circumstances, he did the best he could by stopping the car some distance from the house, but still in view to maintain his watch. Id.

After distinguishing those circumstances from situations in prior cases in which courts had previously found that law enforcement officers' deliberate conduct created exigent circumstances, the Socey court continued:

> Perhaps Detective Brenner could have pursued a different course, less likely to expose the police presence to the occupants in the house. But this

21

We find the teachings of <u>Carillo-Morales</u> instructive in resolving the instant case. We have already concluded that Agent Bingham was reasonable in concluding that Cuero, a suspected felon, was preparing to leave in the van and that the van was likely to contain contraband. Perhaps Agent Bingham could have pursued a different course; he might have waited until Cuero drove away from the house and then have him apprehended by the other agents well out of sight and earshot of the other suspects. But we will not second-guess law enforcement tactics as long as those tactics are neither unreasonable nor employed with specific intent to create an emergency simply to circumvent the warrant requirement.

That Agent Bingham could reasonably believe that a felony suspect was preparing to depart in a car possibly containing contraband makes this case distinguishable from cases such as <u>Munoz-Guerra</u>[27] and <u>United States v. Richard</u>.[28] In each of those cases, law enforcement officers were found to have created the exigency that then required a warrantless entry, as there was no justification for the officers to abandon covert surveillance and confront the suspects.

calculation, made in hindsight, is not relevant to our inquiry. Moreover, the police should not be taxed with having failed to cover every eventuality and to arrange a sufficiently large dragnet to permit all persons leaving the house to be apprehended in perfect silence. As long as the police measures are not deliberately designed to invent exigent circumstances, we will not second-guess their effectiveness. <u>Id.</u> at 1449.

[27]788 F.2d 295 (5th Cir. 1986).

[28]994 F.2d 244 (5th Cir. 1993).

22

In Munoz-Guerra, Drug Enforcement Administration agents who were responding to an anonymous tip placed a residence under surveillance. One of the agents noticed some narcotics in plain view through a window, but instead of maintaining their surveillance and seeking a warrant, the agents knocked at a glass patio door. When a suspect appeared, the officers ordered him to open the door, but he responded that it was locked and he would have to get the key from another room. Fearing that the suspect might retrieve a weapon or destroy evidence, the agents kicked in the door and secured the premises. The government argued that exigent circumstances justified their warrantless entry, but we disagreed. We found that the police were not justified in knocking on the door and thereby forcing a confrontation, as their surveillance was undetected and the premises were effectively secured. We concluded that the officers had created the predicament by choosing to confront the suspects without any provoking acts by the suspects or other justification whatsoever.[29]

Richard is likewise distinguishable from the instant case. There, federal customs agents received information that a person suspected of trafficking narcotics was staying in a particular hotel room. Without attempting to place the premises under surveillance while seeking a warrant, the agents proceeded to that

---

[29]See Munoz-Guerra, 788 F.2d at 298-99 ("Had the police's necessary efforts to secure the premises been visible to the inhabitants or had there been reason to believe that someone in the condominium was in need of immediate succor, the government's position [that exigent circumstances justified the warrantless entry] would have merit.").

23

room, knocked on the door, and identified themselves as law enforcement officers. The occupants responded, "wait a minute." The agents testified that at that moment they heard people whispering and moving about, and doors or drawers being slammed. When finally the agents saw the doorknob turn, they kicked in the door, entered the room, and arrested the occupants. Although the district court agreed with the government that exigent circumstances existed, the court found that those circumstances had been created by the agents when they elected to knock on the door and identify themselves as police at a time when the suspects had not acted in a way to provoke such behavior by the police. We found no clear error in that ruling, noting that there was no reason for the agents to abandon covert surveillance of the room.

In one significant respect the instant case differs markedly from Munoz-Guerra and Richard: Here it was the unprovoked conduct of the suspects that led the agents reasonably to believe that the suspects intended to depart momentarily in a vehicle likely containing contraband. That activity, unprovoked by law enforcement officers, is what prompted the agents to abandon their covert surveillance and confront the suspects, clearly a reasonable tactic under the circumstances.[30] There were no comparable unprovoked acts of the suspects in either Munoz-Guerra or Richard

_____

[30]Compare United States v. Curzi, 867 F.2d 36, 42-43 (1st Cir. 1989) (noting that agents' decision to reveal their presence "was not prompted by any activity in the house or any exigent circumstances") with United States v. Capote-Capote, 946 F.2d 1100, 1103 (5th Cir. 1991) ("This is not a case like Thompson or Scheffer, in which the government controlled the timing of the transaction . . . ."), cert. denied, 112 S. Ct. 2278 (1992).

24

to justify the actions by law enforcement officials; in both of those cases, elective acts of law enforcement agents prompted the activities of the suspects that in turn produced the exigencies.

It is certainly true that the FBI agents here might have foreseen that one or more suspects at the Clear Cove residence would leave in a vehicle believed to contain contraband. But the fact that the exigency may have been foreseeable "does not, by itself, control the legality of a subsequent warrantless search triggered by that exigency."[31] "The important point . . . is that the exigency while perhaps not <u>unexpected</u>, had not been <u>created</u> by the government."[32] And, as discussed above, the exigency here was created by unprovoked actions of the suspects (not of the agents) when they behaved in a manner that could reasonably have led Agent Bingham to conclude that their departure from the premises was imminent.

b. *Voluntariness of Confession and Statements*

Manuel nevertheless contends that even if exigent circumstances did justify the agent's warrantless entry into the Clear Cove residence, the district court still erred in permitting Agents Vasquez and Bingham to testify about statements Manual purportedly made to them after he was arrested.[33] This is so, he

---

[31]<u>United States v. Webster</u>, 750 F.2d 307, 327 (5th Cir. 1984), <u>cert. denied</u>, 471 U.S. 1106 (1985); <u>see</u> <u>United States v. Hultgren</u>, 713 F.2d 79, 88 (5th Cir. 1983) ("The fact that the exigency might have been foreseeable does not control.").

[32]<u>Hultgren</u>, 713 F.2d at 88 (emphasis in original).

[33]Manuel maintains that the agents lied; he claims he never confessed to the agents that he was involved in a conspiracy to

25

insists, because whatever he might have said was coerced and thus involuntary. Manuel correctly notes that the government has the burden of proving by a preponderance of the evidence that a defendant voluntarily waived his constitutional rights against self incrimination and that the statements he made were voluntary.[34] The standard for determining whether a confession or statement was voluntarily made is whether, taking into consideration the "totality of the circumstances," the accused spoke as a result of his free and rational choice, with an awareness of his abandonment of the right to remain silent and of the consequences of that decision.[35]

After Manuel was handcuffed, he was read his Miranda rights in Spanish; he signed an advice-of-rights card in which he acknowledged waiving those rights; and he then accompanied the agents to an upstairs bedroom where the two agents questioned him. The record is devoid of evidence that the agents physically threatened Manuel or made any promises to obtain his cooperation. True, Manuel claims that the agents accused him of being a Columbian drug dealer and stated that he and Debra would be sent to prison for the rest of their lives because of their crimes; but such allegations, even if proved true, would be insufficient,

---

distribute narcotics. We leave the resolution of such credibility choices to the trier of fact.

[34]United States v. Rojas-Martinez, 968 F.2d 415, 417 (5th Cir.), cert. denied, 113 S. Ct. 828 (1992) and 113 S. Ct. 995 (1993).

[35]United States v. Ornelas-Rodriquez, 12 F.3d 1339, 1347 (5th Cir. 1994), cert. denied, 115 S. Ct. 103 (1994).

standing alone, to establish that his subsequent cooperation was involuntary.

2.    Consent Search of the Clear Cove Residence

After the agents had entered and secured the Clear Cove residence by conducting a protective sweep, they asked Manual whether they could search the premises.  Manuel gave the FBI agents his permission, so they searched the Clear Cove residence and the surrounding area and recovered additional evidence that linked that residence to the Ivy Oaks stash house.  Although at neither the suppression hearing nor at trial did Manual object to the introduction of evidence obtained during that search, on appeal he argues that the evidence should have been excluded because his consent to the FBI's search was involuntarily given.  As Manuel did not raise this objection below, our review is limited to a search for plain error.[36]

"A search may be conducted without either probable cause or a warrant if it is conducted pursuant to consent."[37]  "For consent to be valid, however, the government must prove by a preponderance of the evidence that consent was given freely and voluntarily,"[38] a determination which must be based on the totality of the

---

[36]United States v. Iwegbu, 6 F.3d 272, 274-75 (5th Cir. 1993).

[37]United States v. Richard, 994 F.2d 244, 250 (5th Cir. 1993) (citing Scheckloth v. Bustamonte, 412 U.S. 218, 219 (1973)).

[38]Id. (citing United States v. Kelley, 981 F.2d 1464, 1470 (5th Cir.), cert. denied, 113 S. Ct. 2427 (1993)); accord United States v. Hurtado, 905 F.2d 74, 76 (5th Cir. 1990).

circumstances.[39]    "We consider six factors in evaluating the voluntariness of consent:

> (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found."[40]

"Although all six factors are relevant, no single one is dispositive."[41]

After the agents had conducted the protective sweep and had read the handcuffed Manuel his Miranda rights in Spanish, he signed a form consenting to a search of his residence.  Like his claims regarding his statements, Manuel now insists that his consent to search his home was coerced:  The agents had illegally entered his house with guns drawn; had handcuffed him and his wife and removed her from the house; had told him that they had evidence linking him to the narcotics found at the Ivy Oaks residence; and then, without advising him of his right to refuse, had asked him if he would consent to a search of his home.

Not only have we already concluded that the agents entered Manuel's house legally, we discern no record evidence to support Manuel's allegations that the agents obtained his consent by

---

[39]United States v. Gonzalez-Basulto, 898 F.2d 1011, 1012-13 (5th Cir. 1990).

[40]Richard, 994 F.2d at 25-51 (quoting Kelley, 981 F.2d at 1470).

[41]Id. (citing Brown v. Illinois, 422 U.S. 590, 603-04 (1975) and Kelley, 981 F.2d at 1470)).

feigning lawful authority to search the premises, by threatening him, or by promising him anything. The version of the record evidence implicitly credited by the district court also makes clear that Manuel was quite cooperative with the agents and that they recovered very little incriminating evidence from the search of his Clear Cove residence))a fact from which one could deduce that Manuel consented to the search because he believed))correctly))that the agents would find little if any damaging evidence. Although Manuel may have been startled by the fact and manner of his apprehension, not to mention by the repercussions therefrom, we cannot say that the district court committed plain error in finding that Manuel's consent to the search was voluntary. We perceive no grave miscarriage of justice therefrom, given all other evidence and circumstances of the case.

B.   DEBRA RICO

Debra assigns only one point of error on appeal; namely, that her Sixth Amendment guarantee of effective assistance of counsel was violated as a result of an alleged conflict of interest of her trial counsel, Ralph Martinez. "Under the Sixth Amendment, where there exists a constitutional right to counsel, there exists a correlative right to representation that is free from any conflict of interest."[42]  As with many other rights, though, the right to a conflict-free counsel is not absolute. It can be waived if (1) the

---

[42]United States v. Carpenter, 769 F.2d 258, 262 (5th Cir. 1985).

29

waiver is made voluntarily, knowingly, and intelligently,[43] and (2) the conflict is not so severe as to undermine the integrity of the judicial system.[44]  We consider first whether there was an actual conflict of interest; if so, whether Debra did in fact freely and validly waive her right to a representation by a conflict-free attorney; and if that too is so, whether the conflict is nevertheless so severe as to be unwaivable as a matter of law.

1.    Actual Conflict of Interest

Joint representation does not necessarily create a conflict of interest.[45]  "To establish a [S]ixth [A]mendment violation, a defendant who raised no objection at trial must show that an actual conflict of interest affected [her] attorney's performance."[46] Debra claims for the first time on appeal that an actual conflict existed in this case because))by representing both her and her husband))Attorney Martinez could not advance for her the defenses of duress or battered spouse without jeopardizing his defense of her husband, Manuel, in both the instant case and in another prosecution then pending in state court, in which Manuel was charged with sexually abusing Debra's daughter (his step-daughter).

---

[43]United States v. Garcia, 517 F.2d 272, 276-77 (5th Cir. 1975).

[44]United States v. Vaquero, 997 F.2d 78, 90-91 (5th Cir.), cert. denied, 114 S. Ct. 614 (1993).

[45]United States v. Lyons, 703 F.2d 815, 820 (5th Cir. 1983) (citing Holloway v. Arkansas, 435 U.S. 475, 482 (1978)).

[46]Id.; see Cuyler v. Sullivan, 446 U.S. 335, 350 (1980); United States v. Cook, 45 F.3d 388, 393 (10th Cir. 1995) (explaining Cuyler).

30

"An actual conflict exists if `counsel's introduction of probative evidence or plausible arguments that would significantly benefit one defendant would damage the defense of another defendant whom the same counsel is representing.'"[47] Debra's claim of actual conflict rests solely on her assertion that she <u>might</u> have been exonerated if she had had conflict-free counsel who <u>could</u> have advanced the defenses of duress or battered spouse on her behalf. Obviously, that assertion amounts to little more than rank speculation, for the record reflects only that her daughters, but not she, were possibly victims of abuse by Manuel. The record does contain some evidence suggesting that Manuel may have mistreated Debra's daughters, but the only indications that Debra herself might also have been a victim are statements by her daughters))which Debra emphaticly refuted. Even if Debra had been abused by Manuel, the record makes clear that she remained steadfastly unwilling to assert that claim: She has consistently defended Manuel against allegations that he abused her children and has flatly denied that he ever harmed her.

Our decision in <u>United States v. Lyons</u>,[48] governs Debra's Sixth Amendment argument. In that case, one attorney represented both

---

[47]<u>Lyons</u>, 703 F.2d at 820-21 (quoting <u>Baty v. Balkcom</u>, 661 F.2d 391, 395 (5th Cir. 1981), <u>cert. denied</u>, 456 U.S. 1011 (1982)); <u>see</u> <u>United States v. Holley</u>, 826 F.2d 331, 334 (5th Cir. 1987) ("`A conflict of interest is present whenever one defendant stands <u>to gain significantly</u> by counsel adducing probative evidence or advancing plausible arguments that are damaging to the cause of a codefendant whom counsel is also representing.'" (quotation omitted) (emphasis added in <u>Holley</u>)), <u>cert. denied</u>, 485 U.S. 960 (1988).

[48]703 F.2d 815 (5th Cir. 1983).

husband and wife at trial.  On appeal, the wife argued, as Debra does here, that the joint representation violated, inter alia, her constitutional right to a conflict-free counsel.  She urged that she "_might_ have exonerated herself by claiming that she was the innocent dupe of [her husband]."[49]  We noted in _Lyons_ that the record was devoid of evidence of such circumstances and that the wife's allegation "amounts to little more than speculation . . . [and] does not constituted the actual conflict of interest required . . . to obtain relief."[50]  Similarly, the instant record is devoid of evidence that Debra was abused by Manuel.  Her argument that she might have been exonerated on either defense))duress or battered spouse))is pure conjecture, akin to the speculative argument proffered by Mrs. Lyons, which we held insufficient to constitute the type of actual conflict that merits relief.[51]

### 2.    Waiver of Right to Conflict-Free Counsel

But even if we assume arguendo that Martinez' joint representation of Debra and Manuel did create an actual conflict of interest, the record establishes that Debra validly waived her right to a conflict-free counsel.  At Debra's initial appearance,

---

[49]_Id._ at 820 (emphasis added).

[50]_Id._

[51]_See_ _id._ at 820-21; _Holley_, 826 F.2d at 334 ("`Mere speculation about a conflict . . . is insufficient to establish ineffective representation.'" (quotation omitted)); _see also_ _United States v. Solomon_, 856 F.2d 1572, 1581 (11th Cir. 1988) ("Potential or hypothetical conflicts are insufficient; the defendant must be able to point to specific instances in the record showing that defense counsel actively represented conflicting interests."), _cert. denied_, 489 U.S. 1070 (1989).

32

the magistrate judge repeatedly advised her of her constitutional right to separate counsel and warned her of the potential pitfalls of continuing with joint representation.  Her counsel, Martinez, had just alerted the court that he intended to represent both spouses and advised the court that "we may want to do a <u>Garcia</u> waiver or a conflict of interest waiver."  The magistrate judge agreed and then cautioned Debra, in accordance with <u>Garcia</u>, regarding the possible hazards of joint representation:

> [Y]ou [Debra] have the right to a lawyer who is loyal only to you, and there may be some potential conflict between a defense that is in your husband's best interest and a defense that is in your best interest. And this often happens between co-defendants, that evidence that would tend to exculpate one of them tends to incriminate the other.
>
> You need to be aware of the possible conflict of interest by being represented by the same lawyer as your husband, and if you do decide to go forward with this attorney representing both you and your husband, then at least, I would say))well, you'll have to sign the waiver form before the detention hearing. . . .    [Y]ou'll have a chance to read over the forms, discuss them with your attorney, and then, . . . we'll have a formal waiver signature at our next hearing . . . .

That hearing substantially complied with the mandates of <u>United States v. Garcia</u>[52] and Rule 44(c)[53] of the Federal Rules of Criminal

---

[52]517 F.2d 272, 267-77 (5th Cir. 1975).  When an actual conflict of interest exists, we have instructed trial courts to conduct a hearing, commonly referred to as a <u>Garcia</u> hearing, to ascertain the effectiveness of a defendant's waiver of conflict-free counsel.  In that hearing, the court is "to ensure that the defendant (1) is aware that a conflict of interest exists; (2) realizes the potential hazards to [her] defense by continuing with such counsel under the onus of a conflict; and (3) is aware of [her] right to obtain other counsel."  <u>United States v. Greig</u>, 967 F.2d 1018, 1022 (5th Cir. 1992).

[53]Rule 44(c) of the Federal Rules of Criminal Procedure compliments <u>Garcia</u>, similarly providing that:

Procedure.[54]

Again, at Debra's next judicial proceeding, her arraignment and detention hearing, the court reminded her of the conflict issue. This time the court obtained from her a signed document, entitled "Joint Representation By Counsel))Waiver of Conflict of Interest," in which she expressly and in writing waived her right to a conflict-free counsel.

After receiving all of those admonitions, both orally and in writing, Debra chose to waive her right. We are satisfied too that she did so knowingly, intelligently, and voluntarily when ultimately she signed the waiver document. In that instrument, she expressly acknowledged that, inter alia, she had been advised of her right to effective representation, understood the details and potential perils of her attorney's possible conflict of interest, had discussed the matter with her attorney and understood that she could discuss it with outside counsel, and that she knowingly, intelligently, and voluntarily waived the right to conflict-free effective assistance of counsel provided by the Sixth Amendment.

---

> [w]henever two or more defendants . . . are represented by the same retained or assigned counsel . . . the court shall promptly inquire with respect to such joint representation and shall personally advise each defendant of the right to effective assistance of counsel, including separate representation. Unless it appears that there is good cause to believe no conflict of interest is likely to arise, the court shall take such measures as may be appropriate to protect each defendant's right to counsel.

[54]Compare Solomon, 856 F.2d at 1579-80, 1582 (holding that similar admonishments by court complied with Garcia and Rule 44(c)).

34

In the face of all that, Debra now complains unabashedly that the court committed reversible error because it failed to engage her in a colloquy adequate to satisfy Garcia, wherein we recommended that "the court should . . . endeavor to have each defendant personally articulate in detail his intent to forego [the] significant constitutional protection" of a conflict-free counsel.[55] Although in that case we did recommend that trial courts elicit such an exchange, the touchstone of a valid waiver is, as it always has been, that it be made knowingly, intelligently, and voluntarily and in "clear, unequivocal, and unambiguous language."[56] Debra's waiver well satisfies all requirements notwithstanding the absence of such a colloquy.

But our determination that Debra validly waived her right to conflict-free counsel does not end our inquiry. For "[i]f the conflict is so severe as to render a trial inherently unfair, then

---

[55]Garcia, 517 F.2d at 278.

[56]Id. ("We hold only that if, as a matter of fact, a defendant after thorough consultation with the trial judge knowingly, intelligently and voluntarily wishes to waive this protection, the Constitution does not prevent him from so doing."); see United States v. Williams, 809 F.2d 1072, 1085 (5th Cir. 1987), ("The [defendants] knowingly waived their right, intelligently and voluntarily. The law requires nothing more for a valid waiver."), cert. denied, 484 U.S. 896 (1987); cf. United States v. Holley, 826 F.2d 331, 334 (5th Cir. 1987) ("Evaluating the trial court's compliance with Rule 44(c) . . . cannot be divorced from a showing that a defendant has been denied his [S]ixth [A]mendment right to effective counsel. `The inquiry and advice provided for by that rule are not ends in themselves; they are a procedure designed to prevent conflicts of interest.'" (quoting Lyons)), cert. denied, 485 U.S. 960 (1988); United States v. Lyons, 703 F.2d 815, 820 (5th Cir. 1983) ("The trial court's failure to comply with Rule 44(c) does not, of itself, entitle the [defendants] to relief.").

35

the integrity of the judicial system has been undermined, and the accused has been deprived of [her] right to effective assistance of counsel."[57] "We determine whether the integrity of the judicial system has been undermined by reference to the current national standards of legal ethics,"[58] although such standards are not controlling.[59]

"The ABA Model Rules of Professional Conduct provide that an attorney may not represent a client whose interests are adverse to those of another client . . . <u>unless</u> the attorney reasonably believes that the new client's representation will not be affected, and the client consents after having the conflict explained to [her]."[60] Debra was fully apprised of the dangers inherent in the joint representation; she consented to the representation after the conflict was explained to her by both the court and her counsel; and Martinez expressed his reasonable belief that his dual representation would not affect his ability to represent Debra's interests. As neither the defense of duress nor the defense of battered spouse was raised at trial))and, based on the record, it is far from certain whether facts exist that would even plausibly support the raising of either defense))we cannot say that Martinez

---

[57]<u>United States v. Vaquero</u>, 997 F.2d 78, 90 (5th Cir. 1993), <u>cert. denied</u>, 114 S. Ct. 614 (1993).

[58]<u>Id.</u> at 90-91.

[59]<u>In re Dresser Indus., Inc.</u>, 972 F.2d 540, 543-44 (5th Cir. 1992).

[60]<u>Vaquero</u>, 997 F.2d at 91 (citing MODEL RULES OF PROFESSIONAL CONDUCT Rule 1.7(a)).

was unreasonable in believing that his dual representation would not affect his ability to represent Debra. And, as the Supreme Court has noted, the "`"attorney representing two defendants in a criminal matter is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of a trial."'"[61]

Current professional standards do not require a defense counsel to assert every potential defense, regardless how farfetched or implausible. To the contrary, attorneys are routinely cautioned against advancing frivolous positions.[62] And frequently even the most astute advocates elect to forego plausible arguments for tactical reasons or at the client's request. The record before us indicates that there are precious few facts on which a defense counsel could credibly construct an argument that Debra became involved in this multi-kilogram narcotics operation and continued her involvement for a protracted period because she was under duress or was a battered spouse, especially considering that Debra herself was apparently adamant in her refusal to allow either defense to be raised. As such, we cannot say either that the joint representation in this case created an actual conflict or that, if it did, the conflict was sufficient to impugn the judicial

---

[61]Cuyler v. Sullivan, 446 U.S. 335, 347 (1980) (quoting Holloway v. Arkansas, 435 U.S. 475, 485 (1978) (quoting State v. Davis, 514 P.2d 1025, 1027 (Ariz. 1973))).

[62]We recognize, of course, that a lawyer for a defendant in a criminal proceeding may "put the prosecution to its proof even if there is no nonfrivolous basis for defense." MODEL RULES OF PROFESSIONAL CONDUCT Rule 3.1 cmt. (comparing Model Rules with Model Code).

system or render Debra's trial inherently unfair, thereby making her right to conflict-free counsel unwaivable. To the contrary, it was waivable; she did waive it; and she did so knowingly, intelligently, and voluntarily.

## III

## CONCLUSION

Finding no reversible error, the convictions and sentences of Manual and Debra Rico are, in all respects,

AFFIRMED.