### UNITED STATES of America,

v.

### Robert BRODIE.

### Criminal No. 3:96–CR–363–H.

United States District Court,
N.D. Texas,
Dallas Division.

Feb. 18, 1997.

---

Candina S. Heath, Asst. U.S. Atty., Dallas, TX, for Plaintiff.

Franklin R. Mickelson, Federal Public Defender, Dallas, TX, for Defendant.

## MEMORANDUM OPINION AND ORDER

SANDERS, Senior District Judge.

Before the Court is Defendant Brodie's Motion to Suppress, filed December 19, 1996; Government's Response, filed December 26, 1996; Brodie's Reply, filed January 6, 1997; Government's Post–Suppression Hearing

Brief, filed January 28, 1997; and Brodie's Supplemental Memorandum of Law in Support of Motion to Suppress, filed January 31, 1997.

## I. BACKGROUND

Defendant Robert Curtis Brodie ("Brodie") moves to suppress items seized during the execution of a search warrant at his residence. Brodie contends that the affidavit supporting the search warrant contains information obtained from an illegal warrantless search which took place before the search warrant was issued. The Government contends that exigent circumstances, the protective sweep doctrine, and the plain view exception justify the warrantless entry into Brodie's home.

On January 17, 1997, the Court held a hearing on Brodie's Motion to Suppress. Based on the testimony and evidence at that hearing, the Court makes the following findings of fact:

On October 10, 1996, at approximately 4:00 p.m., an Irving police patrol officer detected the smell of ether emanating from Brodie's residence at 1219 Elwood Road, Irving, Texas. Testimony of Tim Boren at 10. Because ether is used in the manufacture of methamphetamine, the officer contacted Irving Police Department narcotics investigators Boren and Langoria, who arrived at the scene at approximately 4:20 p.m. *Id.*

The narcotics investigators drove by the front and side of the duplex and walked a drug detecting dog through a field behind the residence. *Id.* at 12 Neither the investigators nor the dog detected any odor of ether during the initial investigation. *Id.* at 12–13. When the investigators drove by the front of the duplex for the second time, they smelled what they suspected was ether emanating from the residence. *Id.* at 13

After smelling the ether, the plain-clothes investigators approached the residence and attempted to contact Brodie. *Id.* at 14–15. One of the investigators knocked on the front door of the residence, announced himself as a police officer, and asked Brodie to come to the door. *Id.* at 15–16. The investigator heard no response other than a barking dog. *Id.* at 16.

At approximately 4:50 p.m., the investigators requested that a uniformed police officer come to the scene to encourage Brodie to come to the door. *Id.* The uniformed police officer arrived around 5:00 p.m. and knocked on the door of the residence, announcing himself as a police officer and asking Brodie to come to the door. *Id.* at 17. Brodie did not respond but the dog continued to bark. *Id.* The uniformed officer knocked again, this time with his night stick. *Id.* The officers then heard Brodie tell the dog to be quiet. *Id.*

The smell of ether and the failure of Brodie to respond caused the officers to suspect that manufacturing of methamphetamine was going on inside the residence. *Id.* at 28. The officers viewed this situation as "hazardous." *Id.* 18. The officers blocked off the street and evacuated several houses, including the other side of Brodie's duplex. *Id.* at 19–20. The officers called the fire department, which sent a battalion chief and a fire engine. *Id.* at 20.

The officers contacted neighbors to determine who lived at the residence. *Id.* They learned that only Brodie lived at the residence. *Id.* at 31. They learned Brodie's name and phone number. *Id.* at 21. The police called the phone number but no one answered. *Id.* The officers continued to encourage Brodie to come to the door by knocking and by calling him by name. *Id.* at 22.

Sergeant Hubbard, a sergeant in the narcotics division, arrived during this time. After consulting with the investigators, Hubbard decided they should attempt to obtain a search warrant to enter the residence. Testimony of Sergeant Ron Hubbard at 43–44. The two narcotics investigators left the scene to begin the process of obtaining a search warrant. Testimony of Tim Boren at 22.

At around 6:00 p.m., while the investigators were still attempting to procure a search warrant, Sergeant Hubbard and three tactical officers approached Brodie's residence with their guns drawn to encourage Brodie to come outside. Testimony of Sergeant Ron

Hubbard at 44–46. Sergeant Hubbard knocked loudly, calling Brodie by name and telling him to open the door. *Id.* at 46. After about twenty seconds, Brodie answered the door. *Id.* Sergeant Hubbard reached inside the doorway and pulled Brodie outside and down to the bottom of the porch steps. *Id.*

After Brodie was frisked and handcuffed, Sergeant Hubbard ordered Officer Robinson and at least one other officer to conduct a "protective sweep" of the residence. *Id.* at 47, 63–64, 69. Officer Robinson walked through the living room, down a hallway and into a back bedroom. Testimony of Chris Robinson at 79–80. In the back bedroom, Officer Robinson observed a jar containing what he believed to be liquid methamphetamine. *Id.* at 82–83. Based in part on the description of the contents of the jar, a Dallas County Magistrate issued a search warrant at approximately 6:50 p.m.. Testimony of Tim Boren at 37. Approximately two hours later, after the residence had been ventilated, the officers executed the search warrant. *Id.* at 38.

## II. ANALYSIS

■ Warrantless searches are per se unreasonable under the Fourth Amendment. *Payton v. New York,* 445 U.S. 573, 587, 100 S.Ct. 1371, 1380–81, 63 L.Ed.2d 639 (1980); *Katz v. United States,* 389 U.S. 347, 356–57, 88 S.Ct. 507, 513–14, 19 L.Ed.2d 576 (1967). However, certain circumstances can excuse the warrant requirement. The Government argues that exigent circumstances, the protective sweep doctrine and the plain view exception justify the warrantless entry into Brodie's residence. However, for the reasons that follow, none of the exceptions to the warrant requirement applies.

### A. EXIGENT CIRCUMSTANCES EXCEPTION DOES NOT APPLY

■ For the exigent circumstances exception to the warrant requirement to apply, the officers' entry must have been supported by probable cause and necessitated by exigent circumstances. *United States v. Carrillo-Morales,* 27 F.3d 1054, 1060 (5th Cir.1994), *cert. denied,* 513 U.S. 1178, 115 S.Ct. 1163, 130 L.Ed.2d 1119 (1995). Brodie does not dispute that the officers had probable cause to search the residence. Therefore, the issue is narrowed to whether exigent circumstances existed.

■ Exigent circumstances include those in which officers reasonably fear for their safety or where there is an imminent danger of destruction of evidence. *See Welsh v. Wisconsin,* 466 U.S. 740, 749, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732 (1984); *United States v. Rodea,* 102 F.3d 1401, 1404–05 (5th Cir.1996); *United States v. Rico,* 51 F.3d 495, 501 (5th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 220, 133 L.Ed.2d 150 (1995). Among the factors to be considered in evaluating whether exigent circumstances existed are the following: (1) the degree of urgency involved and amount of time necessary to obtain a search warrant; (2) the reasonable belief that contraband is about to be removed; (3) the possibility of danger to the police officers guarding the site of contraband while a search warrant is sought; and (4) the ready destructibility of the contraband. *United States v. Rodea,* 102 F.3d 1401, 1404–05; *United States v. Rico,* 51 F.3d at 501.

■ The burden is on the Government to prove the existence of exigent circumstances. *Vale v. Louisiana,* 399 U.S. 30, 34, 90 S.Ct. 1969, 1971–72, 26 L.Ed.2d 409 (1970); *United States v. Rico,* 51 F.3d at 501. The Government argues that the smell of ether and Brodie's initial refusal to open his door endangered the safety of the officers and the general public.

■ The Court finds that the circumstances did not justify a warrantless entry into Brodie's home and the exigent circumstances exception does not apply. The police officers had no reasonable basis for believing that waiting for a magistrate would have created risks of a greater magnitude than those which are present in any case where the police have probable cause but delay entry pending receipt of a warrant. *See United States v. Munoz–Guerra,* 788 F.2d 295, 298 (5th Cir.1986) (no exigent circumstances because waiting for the warrant did not increase the risks).

Several factors indicate the absence of exigent circumstances. First, approximately two hours elapsed between the time the first officer smelled the ether and the time that the warrantless search was executed. *See G.M. Leasing Corp. v. United States,* 429 U.S. 338, 358–59, 97 S.Ct. 619, 631–32, 50 L.Ed.2d 530 (1977) (IRS agents' delay in executing warrantless search of business premises undermined contention that exigent circumstances existed). *Cf. Rodea,* 102 F.3d 1401, 1409 (finding exigent circumstances because it would have been impossible for officers to have obtained warrant before exigent circumstances arose). Second, two investigators were already on their way to secure a search warrant. *See Munoz–Guerra,* 788 F.2d at 299, n. 4 (that officers already attempting to obtain warrant weighed against presence of exigent circumstances). Third, Sergeant Hubbard, who ordered the warrantless entry into Brodie's home, testified that he did not believe that the situation posed enough danger that he had to break into Brodie's home. Testimony of Ron Hubbard at 63–66. Therefore, Hubbard waited until Brodie voluntarily opened the door. Neither Brodie's initial refusal to open the door nor his subsequent exit gave rise to exigent circumstances. Fourth, the officers had no reason to believe that another person who posed a danger of attack was in the house. See Testimony of Tim Boren at 31; Testimony of Ron Hubbard at 54. Fifth, the officers did not have a reasonable concern that evidence was in imminent danger of destruction. Sixth, ether is a legal, non-controlled substance which has legitimate uses. Testimony of Tim Boren at 24. Seventh, the Irving Fire Department was present but did not think it necessary to enter the residence. *See* Testimony of Tim Boren at 20.

## B. THE PROTECTIVE SWEEP EXCEPTION DOES NOT APPLY

 Officers may conduct a warrantless protective sweep in conjunction with an in-home arrest when the officers have a reasonable belief, based on specific and articulable facts, that the area to be swept harbors an individual posing a danger to those on the arrest scene. *See Maryland v. Buie,* 494 U.S. 325, 337, 110 S.Ct. 1093, 1099–1100, 108 L.Ed.2d 276 (1990). The protective sweep doctrine is inapplicable in this case because (1) Brodie was arrested outside of his residence; (2) the officers did not articulate any specific facts which led them to believe that Brodie's residence harbored individuals posing a danger to those on the arrest scene; and (3) the warrantless search extended beyond the rooms "immediately joining the place of arrest."

## C. THE PLAIN VIEW EXCEPTION DOES NOT APPLY

 The "plain view" exception justifies a warrantless search if the officers are already lawfully in the area. *Coolidge v. New Hampshire,* 403 U.S. 443, 465, 91 S.Ct. 2022, 2037–38, 29 L.Ed.2d 564 (1971). The plain view exception does not apply in this situation because the initial intrusion that brought the officers within plain view of the jar was not supported by a warrant or one of the exceptions to the warrant requirement.

## III. CONCLUSION

Because the affidavit supporting the search warrant contains information obtained from an illegal warrantless search, the items seized during the execution of the search warrant should be suppressed. Brodie's Motion to Suppress is **GRANTED.** Brodie is **DIRECTED** to submit a proposed order listing the specific items to be suppressed not later than *noon, February 24, 1997.*

SO ORDERED.