Shanikwa JOHNSON, Plaintiff,

v.

Mark WATERS, Deputy Constable, et al., Defendants.

No. 6:03–CV–318.

United States District Court, E.D. Texas, Tyler Division.

May 11, 2004.

Curtis Bradley Stuckey, Stuckey, Garrigan & Castetter, Nacogdoches, TX, for Plaintiff.

Robert Scott Davis, Flowers Davis, Tyler, TX, for Defendants.

### MEMORANDUM OPINION AND ORDER

DAVIS, District Judge.

Before the Court is Defendants Mark Waters, Dennis Taylor, J.B. Smith, and Smith County, Texas' Amended Motion for Summary Judgment (Document No. 65) and Plaintiff's Response (Document No. 56). Based on the parties' filings and the applicable law, the Court GRANTS IN PART and DENIES IN PART Defendants' motion.

## Background and Procedural History

On or about October 17, 2002, between approximately 5:00 p.m. and 5:30 p.m., the Smith County Special Crimes Unit of the Smith County Sheriff's Department executed a drug-buy-bust[1] at 4513 Edinburgh, Tyler, Texas. Constable Mark Waters, a licensed Texas Peace Officer, assisted in the operation under the supervision of the sheriff's department. Pre-drug-buy-bust operation briefing revealed the suspect to be Donald Ray Johnson. Further briefing revealed that a black female was suspected of being involved in the illegal drug activity and noted that 4513 Edinburgh was the residence of Johnson's girlfriend. At the time of the drug-buy-bust, Johnson changed the location of the transaction and directed a confidential source and undercover police officer to the residence at 4513 Edinburgh, which had been earlier identified in the briefing as the suspect's girlfriend's house. When the confidential informant and Undercover Officer Suell arrived at the new location, an unanticipated suspect, later identified as Edward C. Neal, was also at the residence with suspect Donald Johnson. The drug-buy-bust involved the sale of 12 ounces of crack cocaine for $5,000.00. The arrest and apprehension of Edward Neal and Donald Johnson occurred in the front yard/driveway area of the residence.

During the operation, Constable Waters was assigned to protect the front entrance of the house. Immediately after the two suspects were arrested in the front yard, Constable Waters entered the residence and conducted a "protective sweep" of the house. Constable Waters testified that he had observed a small child standing between him and an open front door, and that he believed that a suspect or suspects had possibly fled back into the house.

Upon entering the residence, Constable Waters announced "POLICE." He entered a hallway and proceeded to a doorway of a bedroom off the hallway. At the bedroom door, Constable Waters observed a large object, which he determined was an adult person, on a bed. Constable Waters yelled "TYLER PD FREEZE," and fired a shot, which struck Plaintiff Johnson in the arm. Constable Waters claimed that he had seen a movement, either "the hands, a hand, or the upper torso," which caused him to "fear for his life" before he shot. He claimed the natural lighting in the bedroom was dim and stated that he turned on the lights in the room 30 to 45 seconds after the shooting.

Plaintiff Johnson was employed as a jailer by Defendant Smith County at the time she was shot. She testified that she had gotten off of work and had just finished cooking dinner for her children and others before laying down in the bedroom. She testified that she was sleeping when she heard a loud bang from a door hitting the wall. Plaintiff Johnson denies making any sudden movements but concedes that she turned her head to see where the bang came from. Though Johnson admits the lights were not on and that it was dim, she claims it was not dark inside the house and that she could see clearly in the room. Plaintiff Johnson stated that she saw Constable Waters standing in the doorway and saw sparks as the bullet fired from the gun. She testified that she did not get off the bed or start to get off the bed before she was shot. Plaintiff Johnson was not armed and asked Constable Waters why he shot her. She testified that she heard the other officers asking Defendant Waters why he shot her and inquiring as to what he was doing in the house. It is

[1]. A drug-buy-bust is a law enforcement operation, in which illegal drugs are bought by undercover law enforcement officers and/or a confidential source and the arrest and apprehension of the suspects are made immediately after the drug transaction and on location.

undisputed that Plaintiff Johnson was injured and that she has undergone several operations as a result.

Plaintiff Johnson filed suit under 42 U.S.C. § 1983 against Deputy Constable Mark Waters, Constable Dennis Taylor, Smith County Sheriff J.B. Smith, Tyler Police Chief Gary Swindle, Smith County, Texas, City of Tyler, Texas, and Unknown John Does of Smith County and City of Tyler Law Enforcement Officers,[2] claiming that the unlawful warrantless entry into her home amounted to an unlawful search in contravention of the Fourth Amendment; that the subsequent search of her home was conducted in an objectively unreasonable manner in violation of the Fourth Amendment; and that the shooting of Plaintiff Johnson amounted to an unreasonable seizure in violation of the Fourth Amendment. In addition, Plaintiff Johnson asserts municipal/supervisory liability claims against Defendants Smith County, Sheriff Smith, and Constable Taylor based on alleged deficient actual policies, procedures and customs, as well as the alleged retention and hiring of Defendant Constable Waters with actual knowledge of his propensity for misconduct and failure to supervise. Plaintiff Johnson also asserts a claim under the Texas Tort Claims Act against Defendant Smith County, Texas arising out of Constable Waters' alleged negligent use of his weapons. Defendants deny that Plaintiff's constitutional rights were violated and move for summary judgment on all claims; however, in the event that the Court finds such violations occurred, Defendants seek the affirmative defense of qualified immunity.

## Summary Judgment Standard

A motion for summary judgment should be granted if the record, taken as a whole, "together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir.1998). The Supreme Court has interpreted the plain language of Rule 56 as mandating "the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

The party moving for summary judgment, the movant, "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (quoting *Celotex*, 477 U.S. at 323–25, 106 S.Ct. 2548). A fact is material if it might affect the outcome of the suit under the governing law. *Merritt–Campbell, Inc. v. RxP Products, Inc.*, 164 F.3d 957, 961 (5th Cir.1999). Issues of material fact are "genuine" only if they require resolution by a trier of fact and if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Merritt–Campbell, Inc.*, 164 F.3d at 961. If the moving party "fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." *Little*, 37 F.3d at 1075.

---

**2.** On November 24, 2003, the Court signed and entered an Agreed Order of Partial Dismissal Between Plaintiff Shanikwa Johnson and Defendants Gary Swindle, City of Tyler and Unknown City of Tyler John Does, whereby Plaintiff's claims against these defendants were dismissed without prejudice to each party.

If the movant meets this burden, Rule 56 requires the opposing party to go beyond the pleadings and to show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial. *EEOC v. Texas Instruments, Inc.,* 100 F.3d 1173, 1180 (5th Cir.1996); *Wallace v. Texas Tech. Univ.,* 80 F.3d 1042, 1046–47 (5th Cir.1996). The nonmovant's burden may not be satisfied by argument, conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a mere scintilla of evidence. *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 585, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Wallace,* 80 F.3d at 1047; *Little,* 37 F.3d at 1075.

When ruling on a motion for summary judgment, the Court is required to view all justifiable inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348; *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Merritt-Campbell, Inc.,* 164 F.3d at 961. However, the Court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.,* 66 F.3d 89, 92 (5th Cir.), *as modified,* 70 F.3d 26 (5th Cir.1995). Unless there is sufficient evidence for a reasonable jury to return a verdict in the opposing party's favor, there is no genuine issue for trial, and summary judgment must be granted. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 249–51, 106 S.Ct.

2505; *Texas Instruments,* 100 F.3d at 1179.

## 42 U.S.C. § 1983 and Qualified Immunity

Section 1983 provides redress for those who have been injured or deprived of their rights under color of state law.[3] In order to state a valid claim under section 1983, plaintiffs must: (1) allege a violation of rights secured by the Constitution or laws of the United States, and (2) demonstrate that the alleged deprivation was committed by a person [or entity] acting under color of state law. *Leffall v. Dallas Indep. Sch. Dist.,* 28 F.3d 521, 525 (5th Cir.1994) (citing *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988)). It is undisputed that Constable Waters was acting within the scope of his employment at the time of the alleged violations.

However, government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Wilson v. Layne,* 526 U.S. 603, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)); *Evett v. DETNTFF,* 330 F.3d 681, 687 (5th Cir.2003). The Supreme Court has characterized the doctrine as protecting "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

When analyzing qualified immunity issues, a court must first determine whether

---

**3.** The statute reads:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

the plaintiff has specifically alleged a violation of a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). The court must view the facts in a light most favorable to the party asserting the injury. *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151 (citing *Siegert v. Gilley*, 500 U.S. 226, 231, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991)). If no constitutional right would have been violated were the plaintiff's allegations established, then the inquiry ends, and the court need not proceed further. *Id.*

If, however, a violation has occurred, the court must determine whether the right violated was "clearly established." *Id.* The matter must be undertaken in the "specific context of the case, not as a broad general proposition." *Id.* A right is clearly established if its "contours ... [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 202, 121 S.Ct. 2151 (citing *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). In other words, the appropriate inquiry into whether a right is clearly established is whether it would be apparent to a reasonable officer that his conduct was unlawful in the situation he confronted, and that right must be clearly established at the time of the alleged violation. *Id.* (citing *Wilson v. Layne*, 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate. *Id.*

If the plaintiff does prove the violation of a clearly established constitutional right, the court will then determine if the official's conduct was objectively reasonable under the circumstances, such that a reasonably competent officer would not have known his actions violated then-existing clearly established law. *Id.; Siegert*, 500 U.S. at 231–32, 111 S.Ct. 1789; *Glenn v.*

*City of Tyler*, 242 F.3d 307, 312 (5th Cir. 2001). Objective reasonableness is a matter of law for the courts to decide. *See Siegert*, 500 U.S. at 232, 111 S.Ct. 1789; *Williams v. Bramer*, 180 F.3d 699, 702 (5th Cir.1999).

In *Saucier*, the United States Supreme Court instructed that the inquiries for constitutional violations and qualified immunity remain distinct. *See Saucier*, 533 U.S. at 204, 121 S.Ct. 2151. The Court opined that "it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances." *Id.* at 205, 121 S.Ct. 2151. In that case, qualified immunity operates as a shield to protect officers if, in fact, a constitutional violation has been committed, but the officer's mistaken belief was reasonable in light of established law. *Id.* at 205–06, 121 S.Ct. 2151. The defendant's acts are held to be objectively reasonable unless all reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated the plaintiff's constitutional right. *Anderson*, 483 U.S. at 641, 107 S.Ct. 3034; *Cozzo v. Tangipahoa Parish Council*, 279 F.3d 273 (5th Cir.2002) (citing *Thompson v. Upshur County*, 245 F.3d 447, 457 (5th Cir.2001)).

### Fourth Amendment Violations

In this case, as an initial matter, Plaintiff claims that her home was searched without a warrant, and without permission, probable cause and/or any other legal justification. (Pl.'s Compl., ¶ 1). Constable Waters, on the other hand, argues that "exigent" circumstances existed in that he reasonably believed that someone from within the residence might pose a danger

to the officers who were involved in the drug-buy-bust operation so that the need to conduct a "protective sweep" of the residence was immediately necessary.

## 1. Exigent circumstances

It is well established that a warrantless entry into a home is presumptively unreasonable. *Payton v. New York*, 445 U.S. 573, 587, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). However, warrantless entry into a premises may survive constitutional scrutiny if "exigent circumstances" exist to justify the intrusion. *See Minnesota v. Olson*, 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990); *Welsh v. Wisconsin*, 466 U.S. 740, 750, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984); *United States v. Rico*, 51 F.3d 495, 500–01 n. 6 (5th Cir.1995). Frequently cited examples of the types of exigent circumstances that may justify warrantless entry "include those in which officers reasonably fear for their safety, where firearms are present, or where there is a risk of a criminal suspect's escaping or fear of destruction of evidence." *Rico*, 51 F.3d at 501. The officers, however, cannot deliberately create the exigent circumstances in an attempt to circumvent the requirements of the Fourth Amendment. *United States v. Webster*, 750 F.2d 307, 327 (5th Cir. 1984).

■ The standard for whether a police officer may make a protective sweep following an arrest is "if the searching officer possessed a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warranted the officer in believing that the area swept harbored an individual posing a danger to the officer or others." *United States v. Wilson*, 306 F.3d 231, 237 (5th Cir.2002) (citing *Maryland v. Buie*, 494 U.S. 325, 327, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990)). The Fifth Circuit extends the warrantless protective sweep authority to the inside of "a suspect's house 'even if the arrest is made near the door but outside the lodging' if the arresting officers 'have reasonable grounds to believe that there are other persons present inside who might present a security risk.'" *Id.* (citing *United States v. Watson*, 273 F.3d 599, 603 (5th Cir.2001) (finding that officer's belief that suspect might have additional accomplices who were still inside the house and could pose a threat to the officers' safety warranted protective sweep even though factual basis for the belief was disputable)); *see also United States v. Howard*, 106 F.3d 70, 74 (5th Cir.1997) (upholding a finding of exigency on grounds of fear for the officers' own safety and the safety of others, and the possibility of third persons inside the arrested suspect's house being alerted to police presence outside where officers had arrested suspect on the porch of his house and proceeded inside on a warrantless entry); *Rico*, 51 F.3d at 501 (affirming the district court's rationale that officers arresting suspects in the front yard and driveway could make a protective sweep of the residence).

■ Here, Constable Waters submitted evidence in the form of an affidavit that he believed a delay in conducting a protective sweep posed an immediate danger to the officers and others. He stated in his affidavit that the drug-buy-bust transaction involved the sale of 12 ounces of crack cocaine for $5,000.00. He testified that the suspect, Donald Ray Johnson, changed the location of the drug transaction immediately prior to the planned transaction and directed the confidential source and Undercover Officer Suell to a residence at 4513 Edinburgh, Tyler, Texas. Constable Waters noted that the pre-drug-buy-bust operation briefing had revealed 4513 Edinburgh as the residence of Johnson's girl-

friend, who was also suspected as being involved in the illegal drug activity.

When the confidential source and Undercover Officer Suell arrived at the 4513 Edinburgh residence, Constable Waters testified that an unanticipated suspect, later identified as Edward C. Neal, was at the residence with Donald Ray Johnson. Constable Waters stated that the arrest and apprehension of Johnson and Neal occurred in the front yard/driveway area, in close proximity to the residence in question. Constable Waters testified that he did not know who else was in the residence that might pose a danger to themselves or others. He testified that the did not know where the previously reported black female was or whether she presented a danger to the officers and others. Constable Waters testified that his attention was drawn toward the front of the residence where he observed a small child standing between him and an open front door. He stated that he believed that a suspect or suspects possibly fled back into the house. He stated that law enforcement officers are trained and have experience that drug dealers protect their illegal drugs and money with the use of firearms. Based on the aforementioned circumstances, Constable Waters testified that he reasonably believed that the danger posed to the officers at the time was immediate and any delay of the protective sweep in order to secure a search warrant was unreasonable and extremely dangerous. Accordingly, Constable Waters entered the residence immediately after the two suspects were arrested in the front yard to conduct a protective sweep. Plaintiff does not refute this testimony and merely refers to Constable Water's deposition that he was assigned to protect the front entrance of the house and was never told to enter the house.

In this case, the Court finds that there was sufficient circumstantial evidence to support a finding of exigency. Although Plaintiff submits evidence, by way of her own affidavit, that she was laying down on her bed when the above events transpired and clearly posed no threat, Constable Waters could not have known at the time of the arrests if Plaintiff Johnson had been alerted to the police presence or whether she, or anyone else that might also have been in the residence, posed a threat to the officers or to others at the scene. When the officers arrived at the residence, they encountered an unanticipated suspect, Edward Neal. Moreover, the officers did not encounter the black female suspect they had been briefed about, even though the officers had been briefed that 4513 Edinburgh was the address of Johnson's girlfriend. These are specific and articulable facts on which Constable Waters, and his fellow officers, could draw the inference that there was a likelihood that Johnson's girlfriend, and possible accomplice, could be inside the residence and that she might pose a safety risk to officers or others at the scene. Constable Waters' reasonable suspicion that Plaintiff Johnson, or another unexpected person, might be in the residence and might pose a threat to the safety of the officers justified a warrantless entry under the exigent circumstances exception. As in *Watson,* Constable Waters' reasonable belief based on these facts and inferences validates the protective sweep even though the factual basis for the belief is disputable. Thus, the Court finds no constitutional violation occurred in the initial entry of the residence, so that Constable Waters is entitled to summary judgment as a matter of law as to Plaintiff's cause of action for alleged unlawful warrantless entry into her home in contravention of the Fourth Amendment.

■ Because no constitutional violation occurred, Smith County is also entitled to

summary judgment on this claim. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) (holding that a municipality may not be held liable under Section 1983 where no constitutional deprivation has occurred). Further, the facts of this case establish that Deputy Taylor and Sheriff Smith were not personally involved in the events leading up to the incident in question, were not personally involved in the actual drug-buy-bust, did not supervise the drug-buy-bust on that date, and were not present at Plaintiff Johnson's home when the events in question transpired. Accordingly, Deputy Taylor and Sheriff Smith are entitled to summary judgment as to Plaintiff's cause of action for alleged unlawful warrantless entry into her home in contravention of the Fourth Amendment.

### 2. Unreasonable Search

Plaintiff Johnson further alleges that Defendants conducted a search of her house in an unreasonable manner and "trashed" her house in the process. Defendants submit evidence, by way of affidavit testimony, denying that any of the individual defendants engaged in any subsequent search of the residence. Defendants claim that any search or investigation that may have occurred after the shooting incident was not conducted by any of the individual defendants or by Smith County. Plaintiff does not refute this with any evidence of her own. Because Constable Waters, Sheriff Smith, Constable Taylor and Smith County had no involvement in any subsequent search or investigation, they are entitled to summary judgment as to Plaintiff's cause of action for the alleged unreasonable search of her home in contravention of the Fourth Amendment.

### 3. Excessive force

█ Plaintiff has also asserted, pursuant to Section 1983, that the shooting by Constable Waters amounted to an unreasonable seizure in violation of Plaintiff's constitutional rights.

Allegations of excessive use of force in the course of an arrest, investigatory stop, or other seizure implicate the Fourth Amendment's guarantee of freedom from unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 394–95, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). "Excessive force claims, like most other Fourth Amendment issues, are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred." *Saucier*, 533 U.S. at 207, 121 S.Ct. 2151. In *Graham*, the United States Supreme Court noted that "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. The Court cautioned that determining issues of excessive force "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 397, 109 S.Ct. 1865.

In addition, in order to state a claim in this circuit for excessive force in violation of the constitution, a plaintiff must allege "(1) an injury, which (2) resulted directly and only from the use of force that was clearly excessive to the need; and the excessiveness of which was (3) objectively unreasonable." *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir.2000); *Spann v. Rainey*, 987 F.2d 1110, 1115 (5th Cir.1993). The amount of injury necessary to satisfy the Fifth Circuit's requirement of injury to establish a constitutional violation is directly related to the amount of

force that is constitutionally permitted under the circumstances. *Ikerd v. Blair,* 101 F.3d 430, 434–35 (5th Cir.1996).

In this case, Plaintiff Johnson contends that the shooting of her while she lay on her bed unarmed was clearly excessive to the need at hand. For purposes of this inquiry, the Court is constrained to view the facts in the light most favorable to the plaintiff. It is uncontroverted that Plaintiff Johnson was not armed. Accepting Plaintiff's version then and assuming *arguendo* that Constable Waters indeed used excessive force in violation of a constitutional right, the Court must determine if that right was clearly established. According to the Court's opinion in *Saucier,* the appropriate inquiry in determining whether a right is clearly established is whether it would be apparent to a reasonable officer that his conduct was unlawful in the situation he confronted. *Saucier,* 533 U.S. at 202, 121 S.Ct. 2151. In this case, Plaintiff Johnson alleges that Constable Waters violated clearly established law by using deadly force against an unarmed person as she lay on her own bed.

The United States Supreme Court held that "apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner,* 471 U.S. 1, 8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). In *Garner,* the Supreme Court held that deadly force may only be used when the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others. *Garner,* 471 U.S. at 11, 105 S.Ct. 1694. The Supreme Court provided examples of when deadly force may be permissible:

> [I]f the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly

force may be used to prevent escape, and if, where feasible, some warning has been given.

*Garner,* 471 U.S. at 11–12, 105 S.Ct. 1694. Moreover, the *Garner* Court instructed, almost two decades ago, that "deadly force" may not be used by a "police officer ... [to] seize an unarmed nondangerous suspect." *Id.* at 11, 105 S.Ct. 1694. Therefore, on the basis of *Garner* alone, the unreasonable use of deadly force is a clearly defined constitution violation that was "clearly established" at the time of the shooting.

Viewing the facts in a light most favorable to Plaintiff, the Court finds that it was apparent to a reasonable officer, in light of established case law that existed at the time of the shooting, that Constable Waters' conduct was unlawful in the situation he confronted. Though Constable Waters claims he feared for his life when Plaintiff made a sudden movement toward him, a review of the evidence demonstrates that the events at issue fell far short of the necessary justification for the infliction of deadly force. There is nothing in the record that suggests that Plaintiff committed a crime involving the infliction or threatened infliction of serious physical harm. Nor does the evidence show that Plaintiff Johnson threatened Constable Waters with a weapon or attempted to escape. Rather, the evidence shows that Plaintiff merely lay on her bed, unarmed, at the time the events at issue transpired. Constable Waters admitted in his deposition testimony that Plaintiff Johnson was laying on top of the bed when he shot her and that she never got off the bed. However, the evidence shows that Constable Waters did not ascertain who was on the bed or what threat, if any, Plaintiff actually posed before firing.

Plaintiff concedes that she woke and turned her head toward Constable Waters

as he burst into her room. However, Constable Waters' only "warning" to Plaintiff consisted of yelling "FREEZE" while he simultaneously fired off a shot in the direction of Plaintiff. Constable Waters shot Plaintiff regardless of the fact that he had no idea who she was or what threat she posed. He shot her regardless of the fact that he had no idea where the children were located within the residence. Viewing the facts in the light most favorable to Plaintiff, a reasonable officer would had to have known that the unprovoked shooting of an unarmed person while they lay on their bed violated clearly established law and was a use of force clearly excessive to the need at hand.

Finding then, for purposes of this motion, that Constable Waters violated a clearly established constitutional right, the Court must proceed to the next sequential step of the *Saucier* analysis and determine if the defendant's conduct was objectively reasonable so that Constable Waters is nonetheless entitled to qualified immunity. Even though the parties submit conflicting factual accounts of what transpired right before the shooting (*i.e.,* whether Plaintiff turned her head or made whether she made a sudden movement with her "hands, a hand, or the upper torso"), the Court in *Saucier* held that even when there is a question of fact, summary judgment may still be granted on qualified immunity grounds if the officer's mistake as to the facts or law which caused the violation was reasonable. *Saucier,* 533 U.S. at 202, 121 S.Ct. 2151 (opining that "to deny summary judgment any time a material issue of fact remains on the excessive force claim-could undermine the goal of qualified immunity"). The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. *Saucier,* 533 U.S. at 205–06, 121 S.Ct. 2151. Indeed, *Saucier* was based on the idea that police officers will sometimes have difficulty drawing fine legal distinctions under exigent circumstances. *Id.* Qualified immunity thus operates to protect officers from the sometimes "hazy border between excessive and acceptable force." *Id.*

Viewing the evidence in the light most favorable to the plaintiff, there is little doubt that Plaintiff has offered evidence that she was "nondangerous" and that shooting her at close range was an application of force that could have killed her. However, the question becomes whether Constable Waters' mistaken understanding as to whether the particular amount of force he used was legal in the circumstances he confronted warrants him the protection of qualified immunity. Defendant submits evidence, in the form of an affidavit from an expert witness, a licensed peace officer, that Constable Waters' personal deliberation took place in tense, dangerous, rapidly evolving circumstances that required split second decisions. According to his expert, Constable Waters' actions were objectively reasonable and conducted in good faith.

However, Constable Waters and his expert mistakenly define "reasonable," focusing on Constable Water's good faith and subjective beliefs as to the legality of his conduct instead of whether it was objectively reasonable to use deadly force in this situation. At this stage of the analysis, an officer's entitlement to qualified immunity depends not on his subjective beliefs but rather on "the objective question whether a reasonable officer could have believed [the relevant conduct] to be lawful." *Anderson,* 483 U.S. at 641, 107 S.Ct. 3034. At this juncture, the Court presumes that the defendant's acts are objectively reasonable unless *all reasonable officials in the defendant's circumstances* would have then known that the defendant's conduct violated the plaintiff's constitutional right. *Cozzo,* 279 F.3d at

284 (citations omitted) (emphasis added). While Defendant Waters' reasonable beliefs were important in considering whether exigent circumstances existed, a defendant's subjective state of mind has no bearing on whether that defendant is entitled to qualified immunity. *Anderson*, 483 U.S. at 641, 107 S.Ct. 3034.

Constable Waters contends that he treated Plaintiff according to the standard of reasonable officers. Defendant submits, by way of expert affidavit, that law enforcement officers are trained on the concept of "Action is Faster than Reaction" and that, if Constable Waters had waited to confirm or verify that the Plaintiff did not in fact have a firearm and that Plaintiff intended to shoot Defendant Waters, it would have been too late for Constable Waters to have reacted in time. This, according to Defendant, is what a reasonable officer would consider objectively reasonable, legal, and within the parameters of proper law enforcement procedures.

However, the Court considers Judge Kozinki's dissenting opinion in *Idaho v. Horiuchi* to be the better approach. There, Judge Kozinki opined that, "absent a threat, the FBI agents were not entitled to kill; rather, they should have employed one of the many other measures at their disposal... Once a trigger is pulled and life is taken, all these options are foreclosed; the chance for a bloodless resolution is lost." 215 F.3d 986, 999 (9th Cir.2000) (*vacated as moot by Idaho v. Horiuchi*, 266 F.3d 979 (9th Cir.2001)). Judge Kozinki continued, "while an officer need not exhaust remote alternatives before resorting to deadly violence, his failure to employ an obvious non-deadly alternative can make his use of deadly force unreasonable." *Id.* at 1000.

The facts here, viewed in the light most favorable to Plaintiff, do not demonstrate the objective reasonableness of Constable Waters' actions as a matter of law. First,

the facts do not bear out that probable cause existed to believe that Plaintiff Johnson had committed a crime involving the infliction or threatened infliction of serious physical harm so that deadly force was warranted. Further, while Defendant contends qualified immunity should be granted because he was caught in tense and uncertain circumstances, such that his actions were reasonable under the circumstances, the record is devoid of any evidence that Defendant considered any other option before employing the use of deadly force. Drawing every inference in Plaintiff's favor, as the Court must, the more likely scenario is that Constable Waters pulled the trigger first and considered his actions later.

It is uncontroverted that Constable Waters saw a movement when he burst through the door of Plaintiff's room. Plaintiff concedes that she turned her head toward the door at the sound. However, the facts simply do not show that Plaintiff Johnson threatened Constable Waters in any way. She never indicated that she had a gun, or any weapon, or threatened to use such; rather, the evidence shows that even at the time of the shooting, Constable Waters recognized that Plaintiff was laying down on her bed. Nor do the facts show that Plaintiff Johnson was attempting to escape; rather, the undisputed testimony is that she never attempted to move off of her bed prior to being shot. Though briefing included a black female as among the suspects, and though she had not been accounted for at the residence, that fact alone did not justify the infliction of deadly force. When Constable Waters did encounter Plaintiff, he reacted by firing off a shot rather than reasonably assessing the situation. While the record bears out the fact that Constable Waters yelled, "Tyler PD FREEZE" at the door, the record also shows that the warning was given at the same time sparks came from Constable

Waters' gun. Such is hardly an adequate warning, as required by *Garner*, before employing the use of deadly force. Most telling, is that Constable Waters' fellow officers at the scene questioned why he had shot Plaintiff and wanted to know why he was even in the circumstances he found himself in. Accepting Plaintiff's version of the facts as true, Constable Waters' failure to employ an obvious non-deadly alternative before resorting to deadly violence made his use of deadly force unreasonable. In not doing so, the Court finds that Constable Waters was "plainly incompetent or in knowing violation of the law" under the circumstances presented so as to deny him the protection of qualified immunity. Accordingly, the Court finds, on the present record, that Constable Waters' conduct was not objectively reasonable and that Constable Waters is not entitled to summary judgment as a matter of law.

■ However, the facts of this case establish that Deputy Taylor and Sheriff Smith were not personally involved in the events leading up to the incident in question, were not personally involved in the actual drug-buy-bust, did not supervise the drug-buy-bust on that date, and were not present at Plaintiff's Johnson home when the events in question transpired. Because nothing in the record points to the fact that Deputy Taylor or Sheriff Smith ever used any force against Plaintiff Johnson, they are entitled to summary judgment as to Plaintiff's claims of alleged excessive force in violation of the Fourth Amendment.

## Governmental Liability

Smith County also moves for summary judgment on Plaintiff's Section 1983 claims against the county, claiming that Plaintiff can establish no policy, custom or practice that violated her constitutional rights. On August 29, 2003, this Court entered an Order limiting discovery and disclosure pending the Court's ruling on the issue of qualified immunity. Because discovery has thus been limited to the issue of qualified immunity, the issue of the government's liability is premature and Defendant Smith County is not entitled to summary judgment at this time.

## Texas Tort Claims Act

■ Finally, Plaintiff Johnson asserts a claim under the Texas Tort Claims Act against Defendant Smith County, Texas arising out of Constable Waters' alleged negligent use of his weapons in the shooting of Plaintiff Johnson. The pleadings and evidence show that Plaintiff Johnson's injuries arose from the Defendant Waters' use of his gun while acting within the scope of his employment. However, Defendant Smith County denies that it is liable in that it claims there was not any negligent use of tangible personal property by Constable Waters. Alternatively, Smith County asserts that it is entitled to the derivative defense of official immunity.

The Texas Tort Claims Act (the "Act") creates a limited waiver of sovereign immunity. See Tex. Civ. Prac. & Rem.Code Ann. § 101.021. In order for immunity to be waived under the Act, the claims must arise under one of the three specific areas of liability for which immunity is waived and the claim must not fall under one of the exceptions from waiver. A governmental unit in this state is liable for:

(1) property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within the scope of employment if:

(A) the property damage, personal injury, or death arises from the operation of use of a motor-driven vehicle or motor-driven equipment; and

(B) the employee would be personally liable to the claimant according to Texas law; and

(2) personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law.

Tex. Civ. Prac. & Rem.Code Ann. § 101.021.

It is undisputed that Smith County is a governmental unit. *See* Tex. Civ. Prac. & Rem.Code Ann. § 101.001(3)(B). Although immunity may be waived under the provisions of Section 101.021, certain acts are exempted from that waiver of immunity. The Act specifically excludes waiver for a claim "arising out of assault, battery, false imprisonment, or any other intentional tort, . . . ." Tex. Civ. Prac. & Rem.Code Ann. § 101.057(2). When a plaintiff pleads facts which amount to an intentional tort, no matter if the claim is framed as negligence, it is a claim for an intentional tort and barred by the Texas Tort Claims Act. *See, e.g., Tex. Dep't of Pub. Safety v. Petta,* 44 S.W.3d 575, 580 (Tex.2001); *City of Laredo v. Nuno,* 94 S.W.3d 786, 789 (Tex. App.—San Antonio 2002, no pet.); *Tarrant County Hosp. Dist. v. Henry,* 52 S.W.3d 434, 451 (Tex.App.—Fort Worth 2001, no pet.); *Huong v. City of Port Arthur,* 961 F.Supp. 1003, 1009 (E.D.Tex.1997).

The Texas Supreme Court recently held that a claim that evolved from a police officer's attempted shooting of the plaintiff, though couched as a negligence claim, was actually that of an intentional tort barred by the Act. *Petta,* 44 S.W.3d at 580. In *Petta,* the plaintiff was stopped by officers for speeding, and an argument ensued between the officer and plaintiff. *Id.* at 577. When the plaintiff rolled up her windows and refused to exit the vehicle, the officer began beating the window with his nightstick and started yelling obscenities at her. *Id.* at 577–78. The officer then aimed his handgun at the plaintiff and threatened to kill her. *Id.* at 578. The plaintiff fled in her car, and the officer pursued, shooting at her tires more than once during the pursuit. *Id.* The plaintiff sued the officer individually for assault, battery, reckless conduct and terroristic threat, and sued the Texas Department of Public Safety under the Tort Claims Act. *Id.* at 577.

The court determined that the allegations against the department arose from the same conduct that formed the basis of her assault and battery claims against the officer. *Id.* at 580. Specifically, the court found the act of firing at Petta's tires was not negligent, but clearly intentional. *Id.* Thus, the court concluded that the plaintiff's negligence claims against the department fit squarely within section 101.057's exclusion of claims arising out of assault, battery and false imprisonment and were barred by the intentional tort exclusion of the Act. *Id.*

Likewise, in *Huong,* although the plaintiffs attempted to bring a claim for negligence arising from the alleged conduct of the officer in a deadly force case, the Court found the plaintiffs described their claims arising from the shooting as the intentional tort of excessive force. *Huong,* 961 F.Supp. at 1008. The court found that the plaintiffs could not circumvent the intentional tort exception to waiver of municipal liability by simply pleading negligence, when the shooting event on which they based their claim was actually an intentional tort. *Id.* at 1009. The court therefore found that the officer's alleged intentional act of shooting the decedent was a claim for the intentional tort of excessive force and was thus barred by the Act. *Id.*

In this case, Plaintiff concedes that this claim arises out of the wrongful shooting of Plaintiff Johnson. Though couched in terms of negligence, this claim rests, as in *Petta* and *Huong,* on the shooting of Plaintiff by Defendant Waters that gave rise to

Plaintiff's excessive force claims. Accordingly, the Court finds that Plaintiff's claim under the Texas Tort Claims Act are barred by section 101.057's exclusion of claims arising out of assault, battery and false imprisonment, and Defendant Smith County is entitled to summary judgment as a matter of law on this claim.

### Conclusion

For the above reasons, the Court **GRANTS** summary judgment as a matter of law in favor of Defendants Waters, Smith, Taylor and Smith County as to Plaintiff's cause of action for alleged unlawful warrantless entry into her home in contravention of the Fourth Amendment and dismisses Plaintiff's cause of action with prejudice to each party on this claim.

The Court further **GRANTS** summary judgment as a matter of law in favor of Defendants Waters, Smith, Taylor and Smith County as to Plaintiff's cause of action for the alleged unreasonable search of her home in contravention of the Fourth Amendment and dismisses Plaintiff's cause of action with prejudice to each party on this claim.

The Court **GRANTS** summary judgment as a matter of law in favor of Defendants Smith and Taylor as to Plaintiff's claims of excessive force in violation of the Fourth Amendment and dismisses Plaintiff's cause of action with prejudice to Defendants Smith and Taylor on this claim. However, the Court **DENIES** Defendant Waters' Motion for Summary Judgment as a matter of law as to Plaintiff's claims of excessive force in violation of the Fourth Amendment.

The Court **DENIES** Defendant Smith County's motion for summary judgment as to Plaintiff's municipal/supervisory liability claims against Defendants Smith County, Sheriff Smith, and Constable Taylor based on alleged deficient actual policies, procedures and customs, as well as the alleged retention and hiring of Defendant Consta-

ble Waters with actual knowledge of his propensity for misconduct and failure to supervise, without prejudice to reurging of the same.

Finally, the Court **GRANTS** summary judgment as a matter of law in favor of Defendant Smith County as to Plaintiff's claim of negligence under the Texas Tort Claims Act and dismisses Plaintiff's cause of action with prejudice to Defendant Smith County on this claim.